IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JACK D. FERRELL, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 10-cv-00097-DGW |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

**WILKERSON, Magistrate Judge:**

Plaintiff Jack D. Ferrell ("Claimant") applied for disability insurance on September 19, 2007 (Tr. 91). The Social Security Administration denied the application initially on November 14, 2007, and again upon reconsideration on January 23, 2008 (Tr. 21, 46). By decision dated July 22, 2009, the ALJ found that Claimant was not entitled to disability insurance benefits as he was not disabled under the Social Security Act at any time from September 12, 2007 through the date of the decision (Tr. 25). Claimant's request for review by the Appeals Council was denied on November 5, 2009 (Tr. 35). Thus, the administrative law judge's ("ALJ") decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481; *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Claimant now seeks judicial review of the Agency's final decision pursuant to 42 U.S.C. § 405(g). For the reasons stated below, the Claimant's petition is **DENIED**.

# BACKGROUND

## *Claimant's Application for Benefits*

Claimant was born on July 10, 1955 (Tr. 91). He was 55 years-old at the onset of disability date of September 12, 2007. *Id.* Claimant has a GED and worked from 1987 to September 12, 2007 as a service technician supervisor at a tire company (Tr. 13, 94). His job duties included lifting and carrying tires and tools that weighed between 10 to 25 pounds. *Id.* Claimant alleged that he injured his back while lifting tires at work on September 12, 2007, which caused him to stop working (Tr. 27). Claimant also alleges that heart spasms, arthritis, and sciatica limit his ability to work (Tr. 106). Claimant's date last insured is December 31, 2011 (Tr. 25).

## *Summary of Medical Records*

The medical records indicate that Claimant underwent lumbar disc surgery in 1977 (Tr. 218). While at work on September 12, 2007, Claimant experienced a sudden onset of back pain as he stacked tires (Tr. 275). He subsequently developed pain which radiated down his left leg from his thigh to his calf. *Id.* Claimant reported that his symptoms were worse with sitting and standing. *Id.* Dr. Steven Knight, Claimant's family physician, placed him on Naproxen for pain, along with Skelaxin and Lyrica. *Id.* Claimant then underwent an MRI scan study which demonstrated post-operative scarring at L4 and L5 on the right, as well as an old compression deformity at L-4. *Id.* As a result, Dr. Knight referred Claimant to Dr. Steven Kuric, a neurosurgeon.

On September 27, 2007, Claimant saw Dr. Steven R. Turner, a cardiologist, for catherization following an abnormal stress test (Tr. 185). Dr. Turner noted that his angina is now well-controlled and Claimant "has done well from a cardiovascular standpoint." *Id.* His

impression is that Claimant suffered from "some degree of coronary spasm, but with minimal coronary artery disease" (Tr. 187). Dr. Turner, however, remarked that Claimant was experiencing excruciating back pain due to a work injury, and does not seem to be improving with Lortab (Tr. 185). Dr. Turner recommended that Claimant's appointment with Dr. Kuric be expedited because Claimant is "miserable" and is only able to "lay on the couch in a fetal position" (Tr. 186).

On October 3, 2007, Claimant saw Dr. Steven Kuric for complaints of back pain which radiated down to his left leg and right thigh (Tr. 218). Claimant's symptoms became worse when he stood or sat. *Id*. At that time, Claimant was taking Lortab and Naproxin for pain, along with Skelaxin and Lyrica. *Id.* Dr. Kuric reviewed Claimant's previous MRI scan study and noted "changes with the disc at L4-L5 and post-surgical changes on the right" (Tr. 275). He remarked, despite Claimant's complaints of pain he was "a little bit underwhelmed" by the MRI findings, stating that they "are not really very substantial" (Tr. 219). Dr. Kuric recommended that Claimant undergo back surgery or, in the alternative, he be given a prescription for a Medrol dose pack and an epidural steroid injection (Tr. 226). After discussing the options with Dr. Kuric, Claimant chose to take the Medrol and receive an epidural steroid injection *Id.*

On October 16, 2007, Claimant completed an Activities of Daily Living Questionnaire (Tr. 102-104). He indicated that his back and leg pain makes it difficult to use his arms and hands, stand and move about (Tr. 102-103). He experienced difficulty getting up from a chair, getting out of bed, climbing stairs and using a bathtub and shower (Tr. 103). Claimant reported that he only able to sit and stand for minutes at a time, which prevents him from doing simple household chores and preparing meals. *Id*. He stated that he has not driven since the day of his

injury, September 12, 2007. *Id.* Claimant indicated that his only relief comes from lying down, and he estimated that he spent twenty-two hours each day in bed. *Id.*

Claimant continued to experience pain in his left leg, along with numbness and tingling sensation (Tr. 230). As a result, Dr. Kuric suggested that Claimant undergo a lumbar myelogram and CT scan study. *Id.* The October 18, 2007 lumbar myelogram revealed decreased filling of the L5 nerve root on the left at the L4-L5 level, and the CT scan study showed some facet arhropathy, foraminal narrowing at L4 and L5 (Tr. 230). Due to complaints of back pain and numbness and a tingling sensation in his left leg, Dr. Kuric recommended that Claimant undergo a lumbar discectomy at L4-L5 (Tr. 241). Claimant had the procedure done on November 1, 2007 (Tr. 231).

On November 9, 2007, Marion Panepinto, a state agency physician, evaluated Claimant's medical records and completed a Physical Residual Functional Capacity Assessment (Tr. 282-289). The agency evaluator found, based upon the medical records, that Claimant could occasionally lift or carry up to twenty pounds; frequently lift or carry up to ten pounds; stand, sit or walk for a total of six hours in an eight-hour; and perform unlimited pushing and/or pulling (Tr. 282-289). The evaluator found no postural, manipulative, visual, communicative, or environmental limitations that would prevent Claimant from performing work activities. *Id.* The evaluator noted that there were no treating or examining source statements regarding the Claimant's physical capabilities in his file (Tr. 288).

Claimant seemed to be improving on December 4, 2007, as his wound had healed and he no longer had pain in his leg (Tr. 240). Claimant, however, reported pain in his left buttock area (Tr. 241). At that time, Dr. Kuric was unable to determine if the surgery had improved

Claimant's back pain, so he recommended that Claimant continue taking Naproxen but only take the Skelaxin on an as needed basis. *Id.*

Claimant completed a second Activities of Daily Living Questionnaire on December 26, 2007 (Tr. 119-121). Claimant reiterated many of the same complaints written in his previous questionnaire on October 16, 2007. He reported that he was only able to stand for a few minutes, while he could sit for as many as thirty minutes without having to lay down (Tr. 120).

Claimant reported lingering back pain in January 2008 (Tr. 239-240). Dr. Kuric noted that Claimant's wound was "well healed" with no swelling and minimal tenderness (Tr. 240). Claimant primarily complained of pain around the site of the wound, but otherwise seemed to be doing "fairly well." *Id.* A January 1, 2008 MRI revealed a "diffuse posterior disc bulge that is coming in contact with exiting left L-4 nerve root and to a lesser extent right L-4 nerve root in the neural foramina. Enhancing granulation tissue is seen along the left margin of spinal canal is minimally the thecal sac and may be causing mass effect in left L-5 nerve root in the lateral recess" (Tr. 235-236).

Claimant continued to complain of back pain on January 8 and 11, 2008; as a result, Dr. Kuric recommended that he commence physical therapy and placed Claimant on Medrol and an epidural steroid injection (Tr. 239). Claimant subsequently participated in physical therapy until April 2008 (Tr. 321-350). He attended nineteen treatment days, and had eleven cancellations and one no-show day. *Id.*

Claimant returned for a follow-up visit with Dr. Kuric on February 19, 2008 (Tr. 360). Dr. Kuric reported that Claimant had begun physical therapy and was showing improvement, although Claimant still reported pain in his back and his left leg. *Id.* He reviewed the results of the January 1, 2008 MRI scan with Claimant and noted that there was no significant mass effect

on the nerve root. *Id.* Dr. Kuric expressed his amazement that Claimant was still symptomatic more than three months after surgery even though his laboratory work did not show any evidence of inflammatory or infectious change. *Id.* He recommended that Claimant continue physical therapy, as well as his regular doses of Lortab, Skelaxin, Mobic and Lyrica. *Id.* Dr. Kuric also gave Claimant a Medrol dose pack and discussed the alternative of receiving a lumbar epidural steroid injection. *Id.*

On December 17, 2007, Claimant had a follow-up visit with Dr. Knight (Tr. 291-292). Claimant presented with complaints of back pain (Tr. 291). Dr. Knight noted that Claimant's suture line was healed, but he was still having difficulty walking. *Id.* Upon physical examination, Dr. Knight found tenderness over the lumbar vertebra, no swelling or pain, and full range of motion. *Id.* Claimant continued to see Dr. Knight on a monthly basis until November 2008 (Tr. 374-401). Dr. Knight reported similar findings in each report. *Id.*

On January 22, 2008, C.A. Gotway, a state agency physician, evaluated Claimant's medical records and completed a Physical Residual Functional Capacity Assessment (Tr. 313-320). The agency evaluator found, based upon the medical records, that Claimant could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for a total of about six hours in an eight-hour work day; sit for a total of about six hours in an eight-hour workday; and perform unlimited pushing and/or pulling (Tr. 314). No postural, manipulative, visual or communicative limitations were established (Tr. 315-317). Regarding environmental limitations, Claimant should avoid concentrated exposure to hazards such as machinery and heights (Tr. 317). The evaluator noted that he did consider treating and examining source statements regarding the Claimant's physical capabilities in his file (Tr. 319). Based upon his

review of the record, the evaluator concluded that Claimant would be capable of light work activity beginning on November 1, 2008, one year after his surgery (Tr. 320).

By the time he returned to Dr. Kuric for a follow-up visit on April 28, 2008, Claimant had received three transforaminal epidural injections (Tr. 353). Claimant reported some improvement, however, he still complained of pain in his leg. *Id.* Despite his leg pain, Claimant only occasionally took Lortab, and at times, he did not take it at all. *Id.* Claimant told Dr. Kuric that had improved over and beyond his pre-operative state and seemed to feel better than he had at his last visit. *Id.* Dr. Kuric had discussions with Claimant about returning to work, and returning to work with restrictions; but Claimant was concerned about whether returning to work with restrictions would be compatible with his job responsibilities. *Id.* Dr. Kuric told Claimant that his MRI findings were insignificant other than post-surgical changes on the left side. *Id.* Dr. Kuric ruled out taking further diagnostic tests and stated that further surgery may not be beneficial to Claimant. *Id.* Dr. Kuric opined that Claimant may have reached the end of treatment from the standpoint of surgery, as he did not believe the pain in Claimant's leg would subside. *Id.* He then recommended that Claimant undergo a functional capacity evaluation to adequately determine his restrictions. *Id.*

On May 9, 2008, Claimant underwent a physical capacity evaluation (Tr. 403-405). The report found the test results to be "invalid" due to Claimant's "submaximal effort" according to his validity profile (Tr. 403). The report further stated that Claimant's actual functional ability must be determined by professional judgment." *Id.* Claimant exhibited symptom/disability exaggeration indicating that there was a "non-organic component to his pain, medical impairment and disability." *Id.* Dr. Kuric commented that, based upon the invalid test results, he could only guess that Claimant "might be able to work in a sedentary capacity although

7

there's been nothing in his history recently in the office, just discussions with him, that would convince me that he would be willing to do that" (Tr. 352).

On April 13, 2009, Dr. Knight examined Claimant and completed a physical medical source statement (Tr. 407-413). Dr. Knight determined that Claimant was only able to occasionally lift and carry up to ten pounds; sit, stand or walk one hour each, for a total of three hours out of an eight-hour day; and could not sit, stand or walk longer than thirty minutes uninterrupted (Tr. 407-408). He further opined that Claimant was not capable of climbing stairs or ladders, balancing, stooping, kneeling crouching or crawling. *Id.* Dr. Knight did not identify any medical or clinical findings to support his assessment of these limitations. *Id.* He relied upon Claimant's November 2007 discectomy to support his assessment that Claimant was not capable of reaching, handling, fingering, feeling, pushing or pulling with his hands and had restricted use of his feet (Tr. 409).

### *The ALJ Hearing*

Claimant appeared for a hearing before ALJ Sally C. Reason on June 1, 2009. Claimant was represented by Attorney Gary Szezeblewski. Ms. Tracy, a vocational expert was also present.

Claimant testified that he worked as a service technician supervisor for a tire company from 1987 to 2007 (Tr. 9-10). In this role, Claimant changed tires on trucks that weighed between 100 and 200 tons (Tr. 11). He stopped working on September 12, 2007 because of his back injury (Tr. 15).

Claimant testified that his back and leg pain did not improve after his November 2007 surgery (Tr. 15). He stated that his lower back pain radiates up his back and down his left leg into his buttocks, tailbone and knee (Tr. 16). Claimant testified that he reluctantly wore a back

brace each day to prevent further damage, although it caused him excruciating pain. *Id*. He stated that he takes Lortab daily, which does not relieve the pain, rather allows him to "tolerate it." *Id*.

Claimant testified that he was only able to do "small activities," such as making a sandwich or sitting in a lawn chair while he watches his grandchildren play outside (Tr. 17).

When asked about the invalid test results from his physical capacity evaluation in May 2008, Claimant testified that tried as hard as he could to complete the evaluation, but his pain prevented him from continuing (Tr. 17-18). Claimant did not recall making any statements to Dr. Kuric expressing reluctance to returning to work with restrictions (Tr. 18).

Ms. Tracy, a vocational expert, also testified at the hearing. Ms. Tracy testified that Claimant's position as a service technician supervisor qualified as a semi-skilled, heavy exertional position under the DOT guidelines (Tr. 11-13). Considering Claimant's limitations, Ms. Tracy confirmed that Claimant would be unable to perform his previous position (Tr. 13). The ALJ asked Ms. Tracy to consider a hypothetical of an individual of the same age, education, past work history and restrictions as Claimant. Ms. Tracy testified that such a person could perform cashier and assembly work, both of which would be considered light work with occasional postural limitations (Tr. 13).

### *The ALJ's Decision*

The ALJ rendered a decision denying benefits on July 22, 2009. The ALJ evaluated Claimant's application through step five of the sequential analysis and concluded that he was not under a disability as defined in the Social Security Act from September 12, 2007 through the date of the decision (Tr. 25-34).

At step one, the ALJ found that Claimant did not engage in substantial gainful activity during the period of his alleged onset date of September 12, 2007, through his date last insured of December 31, 2011 (Tr. 27).

At step two, the ALJ found that Claimant had the severe mental impairment of lumbar foraminal stenosis. The ALJ further found that Claimant suffered from coronary spasm, but concluded that it was not a severe impairment (Tr. 27, 29).

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled on of the listed in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ concluded that Claimant's lumbar foraminal stenosis did not constitute a disorder of the spine because Dr. Kuric did not find evidence of significant nerve root involvement. Additionally, Claimant exhibited a good range of motion, normal motor/muscle strength, and had no sensory deficits and symmetrical reflexes (Tr. 30).

At step four, the ALJ found the Claimant to have the residual functional capacity to perform light work as defined in 20 § 404.1567(b) with no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling. In coming to this conclusion, the ALJ must follow a two-step process in which she first determines whether there is an underlying medically determinable physical or mental impairment(s) and if so, she evaluates the intensity, persistence, and limiting effects of the Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities (Tr. 30).

In evaluating the Claimant's residual functional capacity, the ALJ found Claimant's reports of impairments not credible due to the discrepancies between the Claimant's assertions and the medical evidence. The ALJ noted that the Activities of Daily Living Questionnaire completed by Claimant on December 26, 2007 to be consistent with Claimant's hearing

testimony that the discectomy did not improve his pain and limitations; specifically, that Claimant still had complaints of back pain radiating to his buttocks and leg which prevented him from standing, walking or ambulating without assistance and performing simple household chores. The ALJ found that these statements were inconsistent with earlier statements made to his physicians that the discectomy had resolved his radicular symptoms and that he no longer had leg pain. Claimant also reported that he only occasionally took his pain medication, Lortab, while some days he did not take it at all (Tr. 31).

The ALJ considered Claimant's residual functional capacity assessment, which was rendered invalid due to his "voluntary sub-maximal effort." The ALJ noted that Claimant seemed to have put forth a sub-optimal effort to comply with physical therapy insofar as the medical records indicate he missed twelve physical therapy appointments due to cancellation or no show. This evidence, combined with Dr. Kuric's concerns about Claimant's reluctance to return to work raised doubts as to Claimant's motivation, adversely affected his credibility (Tr. 32).

The ALJ discounted Dr. Knight's April 2009 medical source statement, finding that the assessment was unsupported by Dr. Knight's own progress notes and other medical opinions of record, including those of treating neurosurgeon, Dr. Kuric, and the state agency physician, Dr. Gotway (Tr. 32).

The ALJ gave "considerable weight" to the opinion of Dr. Gotway, who "had the benefit of, and made reference to, most of the evidence of record, including the pre-operative diagnostic records, the surgical reports, and the post-operative MRI and progress notes." The ALJ noted Dr. Gotway's assessment that within one year of his surgery, Claimant would be capable of performing the exertional demands of light work and occasionally performing postural activities.

The ALJ found this evaluation to be consistent with the record as a whole, including the lack of significant findings in the medical records (Tr. 32).

The ALJ ultimately found that the Claimant was unable to perform his past relevant work as a service technician supervisor (Tr. 33).

At step five, the ALJ found that the Claimant was born on July 10, 1955, and was 52 years-old—defined as an individual closely approaching advanced age—on the alleged onset-of-disability date. The ALJ found that Claimant had the equivalent of a high school education and was able to communicate in English. The ALJ did not make a finding as to the transferability of Claimant's work skills, and concluded that that Claimant was not disabled regardless of transferable job skills. The ALJ made this determination by consulting the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, considering Claimant's age, education, skills and residual functional capacity (Tr. 33-34).

The ALJ also procured the opinion of a vocational expert who testified that a hypothetical individual with the same age, education, past relevant work and residual functional capacity could perform the job as a cashier II or bench assembly work. The vocational expert identified 7,300 such jobs locally and 150,000 in the national economy (Tr. 33-34).

In summary, the ALJ concluded that the Claimant had not been under a disability as defined by the Social Security Act from September 12, 2007, through the date of the decision (Tr. 34).

**DISCUSSION**

To receive disability benefits, a claimant must be "disabled." A disabled person is one whose physical or mental impairments result from anatomical, physiological, or psychological abnormalities which can be demonstrated by medically acceptable clinical and laboratory

diagnostic techniques and which prevent the person from performing previous work and any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A), 1382c(a)(3)(B), 1382c(a)(3)(D).

The Social Security regulations provide for a five-step sequential inquiry for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920. The Commissioner must consider in sequence: (1) whether the claimant is currently employed and doing substantial gainful activity, (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments, (3) whether the impairment meets or equals one listed by the Commissioner and whether it meets the duration requirement, (4) whether the claimant has the residual functional capacity to return to doing his or her past work, and (5) whether the claimant is capable of making an adjustment to some other type of work available in the national economy. *Id.*

If the Commissioner finds that the claimant is disabled or not disabled at any step, she may make her determination without evaluating the remaining steps. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). If there is an affirmative answer at either step three or step five, then there is a finding of disability. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app. 1, subpart P, part 404. However, if the impairment is not so listed, the Commissioner assesses the claimant's residual functional capacity, which in turn is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society under step five. 20 C.F.R. § 404.1520(e). The

claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five. *Id.*

### *Standard of Review*

Under the Social Security Act, a court must sustain the Commissioner's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" of proof. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). *Richardson*, 402 U.S. at 401. The standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." An ALJ need not address every objective finding in the record for his judgment to be supported by substantial evidence. The ALJ "need only build a bridge from the evidence to his conclusion." *Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). The Seventh Circuit urges "a commonsensical reading" of a claimant's medical history, "rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

The deferential substantial-evidence standard applies, *inter alia*, to findings of the claimant's credibility. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ's credibility determinations generally will not be overturned unless they were patently wrong."). An ALJ's decision "cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (stating that "an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws").

Because the Commissioner is responsible for weighing the evidence, resolving conflicts in the evidence, and making independent findings of fact, this Court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Id.* However, the Court does not defer to conclusions of law, and if the Commissioner makes an error of law or a "serious mistake or omission," reversal is required unless the Court is satisfied that no reasonable trier if fact could have come to a different conclusion. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

### *Claimant's Arguments*

Claimant raises two general arguments. First, he argues that the ALJ misconstrued the medical evidence by giving the opinion of his treating physician too little weight. Second, he challenges that ALJ's residual functional capacity determination. The following sections discuss each issue in turn.

**A. The ALJ's Decision Not to Afford Controlling Weight to the Opinion of Claimant's Treating Physician is Supported by Substantial Evidence**

Claimant argues that the ALJ improperly failed to afford any weight to April 13, 2009 physical source statement of Dr. Knight, Claimant's treating physician.

Agency regulations provide that greater weight be given to the opinions of treating physicians because they are "likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527.

The opinion of a treating physician is not always entitled to deference, however. In *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000), the Seventh Circuit held that that a treating physician's opinion "is entitled to controlling weight if it is well supported by the medical

findings and not inconsistent with other substantial evidence in the record" but that a claimant is not "entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" *Id.* So long as the ALJ "minimally articulated his reasons," he may discount a treating physician's opinion if it is inconsistent with that of a consulting physician or other substantial medical evidence. *Skarbeck*, 390 F.3d at 503. An ALJ may also discount a treating physician's medical opinion if it is internally inconsistent. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Here, the ALJ expressly detailed the reasons why he gave "little weight" to Dr. Knight's physical source statement. The ALJ acknowledged Dr. Knight's evaluation of the Claimant, but properly discounted it because his findings were internally inconsistent, and inconsistent with substantial record of evidence. Dr. Knight opined that Claimant had various physical limitations and could only lift and carry up to ten pounds, and could only sit, stand, and walk one hour each for a total of three hours out of an eight-hour work day. He further indicated that Claimant was unable to perform simple daily activities, such as shopping, traveling without a companion, using public transportation, sorting/handling papers or walk a few steps at a reasonable pace without the assistance of a hand rail. Dr. Knight, however, failed to point to any particular medical or clinical findings to support his assessment (Tr. 406-410).

Additionally, a review of the record reveals few significant findings that would account for such severe limitations. In December 2007, Claimant presented with complaints of back pain and decreased range of motion. Dr. Knight noted, however, that the musculoskeletal examination revealed no swelling; no pain and full range of motion; and no deformities; but there was tenderness and Claimant tested positive on the straight leg test (Tr. 291). Dr. Knight reported similar findings on January 9, 2008; February 20, 2008; March 26, 2008; April 29,

2008; May 28, 2008; June 25, 2008; July 28, 2008; August 25, 2008; September 24, 2008; October 24, 2008; November 25, 2008; March 2, 2009 and March 31, 2009 (Tr. 364-401).

Substantial evidence supports the ALJ's assessment of Dr. Knight's April 13, 2009 physical source statement. *See Skarbeck*, 390 F.3d at 504 (upholding the ALJ's decision to discount treating physician's finding that claimant had limited range of motion because it was not supported by x-rays or other medical evidence). As the ALJ observed, the record contains scant objective evidence in support of the alleged severity of Claimant's self-reported symptoms and accompanying pain and discomfort. Dr. Knight's conclusions about Claimant's limitations were based almost entirely on his subjective complaints rather than objective evidence. A claimant is not entitled to disability benefits simply because his physician states he is "disabled" or unable to work. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). Though Claimant may disagree with the ALJ's ultimate weighing of evidence, such disagreement does not provide a basis for overturning the ALJ's decision. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court may not] reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.")

### B. The ALJ's Residual Capacity Determination is Supported by Substantial Evidence

Claimant also contends that the ALJ placed too much emphasis on the functional capacity assessment completed by Dr. Gotway, a state agency physician, on January 28, 2008, which found that Claimant could sustain light work beginning one year after his surgery. Claimant argues that Dr. Gotway's consultative review did not contain any physical therapy reports, a functional capacity evaluation or medical records dated January 2008 to June 2009. He maintains that these records demonstrate that Claimant continued to complaint of back pain that radiated into his left leg and thigh, even after Dr. Gotway's functional capacity assessment.

The ALJ's functional capacity determination was consistent with the opinions of the state agency physicians and Dr. Kuric, and the ALJ is entitled to rely upon their opinions. 20 C.F.R. § 404.1527(f)(2)(i); *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). Furthermore, the ALJ is not required to provide a written evaluation of every piece of evidence, but need only "minimally articulate" her reasoning so as to "make a bridge" between the evidence and her conclusions. *Id.* At 371. Where the ALJ does not reflect any countervailing evidence, she need not articulate her reasons for accepting medical opinions in the record. *Scheck v. Barnhart*, 357 F.3d 697, 700-701 (7th Cir. 2004). The ultimate question is whether the ALJ's decision is sufficiently specific to facilitate a meaningful review. *Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003).

The ALJ's residual functional capacity determination was adequately articulated. In determining the residual functional capacity, the ALJ first examined Claimant's testimony and daily activities. The ALJ noted that Claimant reported to the State Agency on December 26, 2007, that he had constant lower back pain radiating down to his buttocks and legs and that he had severe limitations on his ability to walk, stand, ambulate and was unable to do any simple chores. She considered Claimant's hearing testimony wherein he stated that he experienced no improvement from his discectomy, and that he was still in as much pain at the time of the hearing as he was in before the procedure. She reviewed the findings of the May 9, 2008 physical capacity evaluation, the results of which were rendered invalid due to "sub-maximal effort."

The ALJ concluded that while Claimant's medically determinable impairments could produce the alleged symptoms, Claimant's statements as to the intensity and persistence of these symptoms were not credible. In making that determination, the ALJ considered the statements and findings of Claimant's examining physicians, and explained the weight given to each

18

medical source. After examining the relevant medical evidence, the ALJ determined that the opinions of Claimant's treating neurosurgeon, Dr. Kuric, and Dr. Gotway, the state agency examining physician, were entitled to considerable weight as they were in the best position to provide an assessment of Claimant's limitations. Both Dr. Kuric and Dr. Gotway concluded that there was no medical basis to explain the severity of symptoms and degree of limitation reported by the Claimant. The ALJ afforded little weight to the physical source statement of Dr. Knight, Claimant's treating physician, because he failed to identify any medical findings to support his assessment or explain why his findings support the extreme limitations assessed. The ALJ also discounted Dr. Knight's assessment because it is inconsistent with his own progress notes. Relying heavily on Dr. Gotway's residual functional capacity assessment, the ALJ concluded that Claimant is capable of performing light work, with no more than occasional climbing, balancing, stooping, kneeling, crouching or crawling.

After determining Claimant's residual functional capacity, the ALJ cited testimony from the vocational expert that explained, given the Claimant's age, education, past work experience, and residual functional capacity, the individual could perform the jobs of cashier II and bench assembly worker.

The Court concludes that the residual functional capacity analysis performed by the ALJ is sufficient to create the logical bridge from the evidence to her conclusion. *Rice*, 384 F.3d at 370. In the instant case, the ALJ thoroughly examined Claimant's testimony, in addition to the medical evidence and concluded that Claimant's statements were not consistent with the medical evidence. Further, the ALJ examined and explained the various inconsistencies in Claimant's testimony. She also examined the opinions of Claimant's treating physicians, as well as the

opinions of the state agency physicians. Accordingly, the Court finds that the ALJ's residual functional determination is supported by substantial evidence.

## CONCLUSION

Based upon the foregoing, the Court finds that the ALJ's decision that Claimant Jack Ferrell was not disabled is supported by substantial evidence on the record as a whole. Therefore, Claimant's petition is **DENIED**.

**DATED: September 26, 2011**

**DONALD G. WILKERSON**
**United States Magistrate Judge**